14-2428-cr
United States v. Bert

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————————

August Term, 2014

(Argued:    April 27, 2015                    Decided: February 9, 2016)

Docket No. 14-2428-cr

————————————

UNITED STATES OF AMERICA,

*Appellee,*

v.

RAHEEM BERT, aka Raheen Linwood, aka Radio,

*Defendant-Appellant.*

————————————

Before: JACOBS, POOLER, and HALL, *Circuit Judges.*

Appeal from the judgment of the United States District Court for the

Eastern District of New York (Mauskopf, *J.*), convicting defendant Raheem Bert

of possessing a firearm with an obliterated serial number, in violation of 18

1

CERTIFIED COPY ISSUED ON 02/09/2016

1    U.S.C. § 922(k), and being a felon in possession of a firearm and ammunition, in

2    violation of 18 U.S.C. § 922(g)(1). The Speedy Trial Act was violated when the

3    district court allowed eleven months of unexcluded time to accumulate when

4    Bert's suppression motion was under advisement. We conclude that the district

5    court erred in the manner in which it applied and balanced the factors relevant

6    both to determining whether Bert's indictment should be dismissed with or

7    without prejudice under the Speedy Trial Act and to determining whether his

8    Sixth Amendment right to a speedy trial was violated, and we remand so that

9    the district court may further consider its application and balancing of those

10   factors. We intimate no view as to what conclusions the district court should

11   reach with respect to these issues on remand.

12        Affirmed in part and remanded.

13   Judge Jacobs concurs in part and dissents in part in a separate opinion.

14                        _____

15                        JAMES DARROW, New York, NY, *for*
16                        *Defendant-Appellant Raheem Bert*.
17
18                        DOUGLAS M. PRAVADA, Assistant United States
19                        Attorney (Amy Busa, Assistant United States Attorney,
20                        *on the brief*), *for* Kelly T. Currie, acting United States
21                        Attorney for the Eastern District of New York,
22                        Brooklyn, NY, *for Appellee*.

1    POOLER and HALL, *Circuit Judges*:

2         We initially disposed of this appeal by opinion issued on September 10,

3    2015. *See United States v. Bert*, 801 F.3d 125 (2d Cir. 2015). We hereby withdraw

4    that original opinion and decide Bert's appeal as follows.

5         Defendant Raheem Bert appeals his conviction in the United States District

6    Court for the Eastern District of New York (Mauskopf, *J.*), after a jury found him

7    guilty of possessing a firearm with an obliterated serial number, in violation of

8    18 U.S.C. § 922(k), and being a felon in possession of a firearm and ammunition,

9    in violation of 18 U.S.C. § 922(g)(1). The Speedy Trial Act was violated when the

10   district court allowed eleven months of unexcluded time to accumulate when

11   Bert's suppression motion was under advisement. On appeal, Bert argues that

12   the district court abused its discretion by dismissing his original indictment

13   without prejudice rather than with prejudice, thereby permitting the

14   reprosecution that has resulted in the judgment of conviction that Bert is now

15   appealing. In a similar vein Bert also asserts the district court erred when it

16   determined his Sixth Amendment speedy trial rights were not violated. Finally,

17   Bert argues that the district court erred in denying his motion to suppress. For

18   the reasons that follow, we AFFIRM the district court's decision denying the

3

1    motion to suppress, and we REMAND for further consideration of the Speedy

2    Trial Act and Sixth Amendment speedy trial issues consistent with this opinion.

3                              **BACKGROUND**

4            On January 19, 2012, Bert was arrested in the hallway outside his

5    girlfriend's apartment at 55 Holland Avenue, a Staten Island building

6    participating in New York City's Field Trespass Affidavit Program. Earlier that

7    evening, Officer John Fahim and Officer Besim Pelinku received a radio report

8    that five African-American males were trespassing at 55 Holland Avenue. Upon

9    arriving at the building, the officers encountered two African-American males in

10   the lobby who admitted they had no business in the building. After instructing

11   those men to leave the building, the officers spoke with the building's security

12   guard, who informed them that the three other trespassers had gone either to the

13   10th or 12th floor. On the 10th floor, the officers encountered Bert, another

14   African-American male, and a woman standing and talking together. When

15   questioned by the officers, the three individuals claimed that they were visiting a

16   friend who lived in a nearby apartment. Officer Fahim then knocked on the

17   apartment door to determine whether, in fact, these persons were visiting the

18   resident of that apartment. The resident of that apartment was unable credibly to

4

confirm that she knew Bert or his companions. It is undisputed that, at this point, Bert was not free to leave. *See United States v. Bert*, No. 12-CR-100 (RRM), 2014 WL 358983, at *2 (E.D.N.Y. Feb. 3, 2014).

During this exchange, Bert paced back and forth and at one point turned away to face the window prompting Officer Pelinku to draw his firearm and demand that Bert turn around and show his hands. At about the same time, Officer Fahim observed that Bert had a gun on his person. A struggle ensued between Officer Fahim and Bert, during which Bert dropped the gun out of the 10th floor window. *See id.* at *2. The officers subsequently arrested Bert.

Bert appeared in New York state court the following day. On January 30, 2012, after his state charges were reduced, Bert was transferred to federal custody. He first appeared in the Eastern District of New York on February 16, 2012, on a two-count indictment charging him with possessing a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k), and being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).

By motion filed June 25, 2012, and supplemented by four additional submissions over the next six months, Bert sought to suppress statements he made to the officers on the evening following his arrest and during his transfer to

federal custody.[1] Government witnesses testified that, during these exchanges, Bert had boasted that he could not be prosecuted because the gun recovered from outside the 10th floor window was not operable. In his suppression motion, Bert argued that admitting these statements would violate his rights under the Fourth and Fifth Amendments because they were the fruits of his unlawful seizure, made in the absence of a *Miranda* warning and not preceded by a knowing and voluntary waiver of his Fifth Amendment rights. The district court held a one-day suppression hearing on November 20, 2012. The transcript of that hearing was corrected, pursuant to the government's request, over the next two months.

On February 1, 2013—after the matter had been fully briefed and the hearing transcript corrected—the district court took Bert's suppression motion under advisement. During the twelve months that followed, Bert remained in prison, presumptively innocent, with no apparent activity in his case. The docket sat idle until February 3, 2014, over a year later, when the district court denied Bert's suppression motion in its entirety.

---

[1] Bert also initially moved to suppress the gun, the gun's magazine, and Officer Fahim's observations, but he withdrew this portion of his suppression motion at an October 31, 2012 status conference. *Bert*, 2014 WL 358983, at *6.

1    On February 20, 2014, Bert filed a motion to dismiss the indictment with

2    prejudice asserting that he had not been brought to trial within the timeframe

3    required under the Speedy Trial Act and also claiming that the delay violated

4    his constitutional rights under the Sixth Amendment's Speedy Trial clause. The

5    government, conceding that the Speedy Trial Act had been violated, argued that

6    the dismissal should be without prejudice, as authorized by 18 U.S.C.

7    § 3162(a)(1).

8    Ruling from the bench, the district court rejected Bert's constitutional

9    argument, but concluded that the indictment must be dismissed pursuant to 18

10   U.S.C. § 3162(a)(2) because the delay violated the Speedy Trial Act. After

11   "quickly tick[ing] through the factors in the statutory analysis," Special App'x at

12   31, the district court found that "all of the factors tip[ped] in favor of the

13   government's position on [the] motion," Special App'x at 34. It ordered that the

14   dismissal of the indictment be without prejudice to Bert's reprosecution.

15   That same day, the government re-indicted Bert on identical charges. A

16   three-day trial commenced on May 19, 2014, and the jury returned a verdict of

7

1    guilty on both counts. The district court then sentenced Bert principally to a term

2    of 120 months' imprisonment.[2]

3            Bert appealed, arguing that the district court erred in denying his

4    suppression motion and finding no violation of his Sixth Amendment right to a

5    speedy trial, and abused its discretion by dismissing the original indictment

6    without prejudice.[3]

7

---

[2] Bert remained incarcerated until October 21, 2015, when he was released
pursuant to an order of the district court. On September 10, 2015 this court had
issued an opinion reversing the judgment and remanding the case with
instructions to vacate Bert's conviction and dismiss the indictment with
prejudice. This court, however, did not issue the mandate. On September 14,
2015, while the government was still deciding whether to seek a rehearing, Bert
moved to be released on bail pending issuance of the mandate. The district court
initially denied that motion with leave to renew. After the government informed
the court that it would not seek further review and that it had no objection to the
defendant's immediate release from custody, the district court then issued an
order, on October 20, 2015, directing that Bert be released from custody
immediately. We interpret that order as having released Bert on bail pending
issuance of the mandate. Bert remains free as of this date.

[3] Bert could not have immediately appealed the dismissal of the indictment
without prejudice because that judgment was neither a "final order" within the
meaning of 28 U.S.C. § 1291, nor a collateral order. Rather, a dismissal without
prejudice is a "step toward final disposition of the merits of the case [that] will . .
. be merged in [the] final judgment," *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S.
541, 546 (1949), and therefore only became appealable after Bert was convicted
and sentenced.

# DISCUSSION

## Suppression of Bert's Post-Detention Statements

We address first Bert's contention that the district court erred by denying his motion to suppress the statements he made on January 19, 2012 after he was detained by police officers in the apartment building at 55 Holland Avenue.[4] Bert argues that the officers lacked reasonable suspicion under *Terry v. Ohio*, 392 U.S. 1 (1968), to hold him and that the detention was primarily motivated by his race. We disagree.

A police officer may detain an individual for questioning if the officer has "a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity." *United States v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008). The officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion on a citizen's liberty interest." *United States v. Elmore*, 482 F.3d 172, 178–79 (2d Cir. 2007) (alteration omitted). "While the officer may not rely on an inchoate and unparticularized suspicion or hunch, he is entitled to draw on his own experience and specialized training to make inferences from and deductions

---

[4] On appeal, Bert does not challenge any of the district court's other rulings

9

about the cumulative information available to him that might well elude an untrained person." *Padilla*, 548 F.3d at 187 (alterations and citation omitted).

On appeal of a suppression ruling, we review the district court's reasonable suspicion determination *de novo* and its factual findings for clear error, viewing the evidence supporting denial of the suppression motion in the light most favorable to the government. *Id.* at 186. "In reviewing reasonable suspicion determinations, we look to the totality of the circumstances to see whether the officer had a particularized and objective basis to suspect criminal activity." *Id.* at 187 (quotation omitted). In this regard, "*Terry* recognized that a 'series of acts, each of them perhaps innocent in itself,' can when 'taken together warrant[ ] further investigation.'" *Id.* (alteration in original) (quoting *Terry*, 392 U.S. at 22).

Here, Officers Fahim and Pelinku had reasonable suspicion to believe that Bert was trespassing in the apartment building. The officers were responding to a radio call indicating that there were five African-American male trespassers inside the building. The officers encountered two of the trespassers in the lobby of the building, whom they instructed to leave, and the officers were told by the

_____

regarding his motion to suppress.

10

1    security guard that the other three trespassers might be on the 10th or 12th floor.

2    The officers then encountered three African-American individuals, including

3    Bert, another male and a female, on the 10th floor. Because the officers were

4    specifically directed to a location where trespassers could be found, because Bert

5    was found at that location, and because Bert admitted he did not live in the

6    building, the officers were permitted to briefly detain Bert in order to investigate

7    his claim that he was visiting a friend in an adjacent apartment. *See Hiibel v. Sixth*

8    *Jud. Dist. Ct. of Nev.*, 542 U.S. 177, 185 (2004).

9         Bert contends that the court failed to consider factors that weighed against

10   a finding of reasonable suspicion, including that there were discrepancies

11   between the descriptions of the persons provided in the initial call to police and

12   the persons whom the police encountered in the apartment building, that Bert

13   and his companions were peaceful and cooperative, and that Bert was not

14   wearing a jacket inside the building, which may have indicated that he was

15   visiting someone there. These facts lose significance, however, given the security

16   guard's specific description of the trespassers' location, which was where Bert

17   and his companions were ultimately found. On the facts available to them, the

18   police were entitled to investigate the circumstances and to determine whether

11

Bert was visiting a friend, as he claimed. Given the totality of the circumstances, the district court did not err in determining that the officers had reasonable suspicion to detain Bert and that suppression of his subsequent statements was therefore not warranted.

**Speedy Trial Act Claim**

We next address Bert's claim under the Speedy Trial Act. Because we are remanding for the district court to rebalance its application of the Speedy Trial Act factors in this case, we first delineate the legal framework within which that analysis takes place, and then examine the district court's application of that framework to the facts presented.

## I. <u>Violation</u>

The Speedy Trial Act mandates that a criminal defendant must be brought to trial within 70 days of the filing of the indictment or the defendant's initial appearance, whichever occurs later. *See* 18 U.S.C. § 3161(c)(1). If that deadline is not met, the Act provides that the indictment "shall be dismissed on motion of the defendant." 18 U.S.C. § 3162(a)(2).

The Act excludes from the 70-day indictment-to-trial period delays due to certain enumerated events. *See* 18 U.S.C. § 3161(h). In this case, the parties agree

12

that the district court properly excluded the period of time from when the

motion was filed until it was taken under advisement, 18 U.S.C. § 3161(h)(1)(D),

as well as the first thirty days that it was under advisement, 18 U.S.C. §

3161(h)(1)(H). It is similarly undisputed that the remaining eleven months that

the motion was pending were not excluded. Accordingly, the Act's 70-day

indictment-to-trial period (commonly referred to as the "speedy trial clock") was

exceeded by approximately nine months.

In the year that Bert's suppression motion remained under advisement,

several key dates passed with no activity in his case. Bert's speedy trial clock

began to run on March 4, 2013, when the 30-day advisement period ended. His

speedy trial clock expired 70 days later, on May 13, 2013. The district court's

six-month list came and went in September of 2013, still with no activity in Bert's

case. It was not for another five months that the district court ultimately denied

the motion. At no point did the government alert the district court to any

impending speedy trial issues, nor did it move to exclude any of the time that

had accumulated in the interim.

Neither party contests that a violation of the Speedy Trial Act occurred,

and they do not question the statute's unambiguous mandate that the court was

13

1    required to dismiss the indictment upon Bert's motion. The only dispute with

2    respect to the Speedy Trial Act is whether the district court should have

3    dismissed Bert's indictment with or without prejudice. Bert argues that the

4    district court failed to consider or properly weigh the 18 U.S.C. § 3162(a)(2)

5    factors when it decided that dismissal without prejudice was warranted. He

6    further contends that dismissal with prejudice is the only appropriate remedy

7    under the circumstances because the delay at issue here was lengthy, the product

8    of "administrative neglect," *United States v. Stayton*, 791 F.2d 17, 22 (2d Cir. 1986),

9    and presumptively prejudicial given that he remained incarcerated while the

10   motion was pending.

11   **II.    Framework for Determining the Remedy**

12        It is well established that "Congress did not intend any particular type of

13   dismissal to serve as the presumptive remedy for a Speedy Trial Act violation."

14   *United States v. Taylor*, 487 U.S. 326, 334 (1988); *accord United States v. Caparella*,

15   716 F.2d 976, 980 (2d Cir. 1983). Rather, "[t]he determination of whether to

16   dismiss an indictment with or without prejudice is committed to the discretion of

17   the district court." *United States v. Wilson*, 11 F.3d 346, 352 (2d Cir. 1993).

14

1   The Act does, however, set out factors that a district court must consider in

2   choosing between the two remedies:

3       In determining whether to dismiss the case with or without prejudice, the
4       court shall consider, among others, each of the following factors: the
5       seriousness of the offense; the facts and circumstances of the case which
6       led to the dismissal; and the impact of a reprosecution on the
7       administration of this chapter and on the administration of justice.
8
9   18 U.S.C. § 3162(a)(2). "In addition to these statutory factors, the Supreme Court

10  has indicated that prejudice to the defendant should also be considered."

11  *Wilson*, 11 F.3d at 352 (citing *Taylor*, 487 U.S. at 334).

12      A district court is not free simply to exercise its equitable powers in

13  fashioning an appropriate remedy for a violation of the Speedy Trial Act, *Taylor*,

14  487 U.S. at 332–33, but "must carefully consider those factors as applied to the

15  particular case and, whatever its decision, *clearly articulate their effect in order to*

16  *permit meaningful appellate review*," *id.* at 336 (emphasis added). "To permit

17  appropriate appellate review, the district court should explicate as clearly as

18  possible the bases for its conclusions as to each factor." *United States v. Giambrone*,

19  920 F.2d 176, 180 (2d Cir. 1990). "Although the role of an appellate court is not to

20  substitute its judgment for that of the trial court," the factors identified in the

21  statute call for "more substantive scrutiny" in order to determine "whether [the]

15

district court has ignored or slighted a factor that Congress has deemed pertinent to the choice of remedy." *Taylor*, 487 U.S. at 336–37. We will not lightly disturb "the district court's judgment of how opposing considerations balance," as long as all "the statutory factors are properly considered, and supporting factual findings are not clearly in error." *Id.* at 337.

### A.   Seriousness of the Offense

Because neither party disputes that Bert's crime was serious, we need not dwell on this first factor. But we note that "[w]here the crime charged is serious, the sanction of dismissal with prejudice should ordinarily be imposed only for serious delay." *United States v. Simmons*, 786 F.2d 479, 485 (2d Cir. 1986). The seriousness of the delay is not a standalone factor, though. As we explain below, the length of the delay is a component of both the "facts and circumstances" factor[5] and the "prejudice" factor, and together these two factors determine the seriousness of the delay. Thus, the fact that the underlying offense is serious may

---

[5] This factor is sometimes referred to as the "reason for delay" factor, but we think that term bestows upon the factor an unduly narrow scope. We instead use the label "facts and circumstances," which reflects the fact that in evaluating this factor the district court must take into account not only the reasons for the particular delay in the instant case, but also the length of the delay and whether any neglect that caused the delay at issue is part of an ongoing pattern.

16

be outweighed by the other factors, and the length of the delay may contribute to such a counterweight.

**B.    Facts and Circumstances Leading to Delay**

This second statutory factor focuses equally on the impact of the court's conduct and the impact of the government's conduct on any judicial delay. *United States v. Pringle*, 751 F.2d 419, 429 (1st Cir. 1984) (noting that the Speedy Trial Act "is as much aimed at the delay caused by judicial congestion and mismanagement as it is aimed at the deliberate stalling of counsel"). "The Act controls the conduct of the parties and the court itself during criminal pretrial proceedings. Not only must the court police the behavior of the prosecutor and the defense counsel, it must also police itself." *Stayton*, 791 F.2d at 20 (quoting *Pringle*, 751 F.2d at 429); *see also United States v. Moss*, 217 F.3d 426, 432 (6th Cir. 2000) ("[T]he purposes of the Act would be thwarted if courts do not adjust their day-to-day procedures to comply with its requirements"); *United States v. Ramirez*, 973 F.2d 36, 39 (1st Cir. 1992) ("When a STA violation is caused by the court or the prosecutor, it weighs in favor of granting a dismissal with prejudice."). District courts must hold themselves accountable for ensuring their own compliance with the Speedy Trial Act's requirements. A district court may

17

not merely assume responsibility for a speedy trial violation, find no improper motive, and then weigh this statutory factor in favor of dismissal without prejudice without providing further explanation for its determination.

The sanction of dismissal with prejudice does not always require a finding of "evil motive." *Caparella*, 716 F.2d at 980. On the contrary, this "facts and circumstances" factor may tip in favor of dismissal with prejudice in situations where the delay is attributable to a "truly neglectful attitude." *Taylor*, 487 U.S. at 338.

We have held that negligent conduct by the court or the government "renders the second factor [(reason for the delay)] neutral, at best" where the "delay [is] not overly long" and there has been no showing of prejudice. *Simmons*, 786 F.2d at 486. *But see Caparella*, 716 F.2d at 980 ("[G]iven the government's negligent conduct, . . . we conclude that the second factor militates in favor of dismissal with prejudice."). The Supreme Court has likewise instructed that courts should only preclude reprosecution of a serious crime upon a showing of "something more than an isolated unwitting violation," such as a finding of "bad faith" or a "pattern of neglect." *Taylor*, 487 U.S. at 339. But we emphasize that a finding of "bad faith" is not a prerequisite to dismissal with

18

1 prejudice. *Id.* A rule that limited the sanction of dismissal with prejudice

2 exclusively to cases involving bad faith would contravene the well-established

3 principle that "[t]he Speedy Trial Act does not indicate a preference as between

4 dismissals with and dismissals without prejudice." *Giambrone*, 920 F.2d at 180

5 (citing *Taylor*, 487 U.S. at 334-35). A factually supported finding of a pattern of

6 neglect, thus showing a "truly neglectful attitude," either on the part of the

7 government or the court, may alone suffice to tip the "facts and circumstances"

8 factor in favor of dismissal with prejudice. *Cf. United States v. Hernandez*, 863 F.2d

9 239, 244 (2d Cir. 1988) (noting dismissal inappropriate "in the absence of a

10 factually supported finding of bad faith *or a pattern of neglect*" (emphasis

11 added)).[6] Finally, it is firmly established that the length of the delay, as "a

12 measure of the seriousness of the speedy trial violation," *Taylor*, 487 U.S. at 340,

---

[6] The dissent claims that our assertion that "a pattern of neglect (warranting dismissal with prejudice) may be manifested either by the government *or by the court*" has no support in this circuit's case law. Dis. Op. at 5. To the contrary, in *Stayton* we determined that the "facts and circumstances" factor tipped in favor of dismissal with prejudice where "the court [had] ignored the persistent prodding of the government to decide the outstanding motions and proceed to trial." *Stayton*, 791 F.2d at 21. Moreover, in *Stayton* we affirmatively cited *Pringle*, the First Circuit case that the dissent implicitly rejects and upon which we now rely. *Id.* at 20. We are not altering Second Circuit law, as the dissent suggests, but merely holding explicitly what we have previously implied.

19

1    is a critical consideration in evaluating the facts and circumstances that led to the

2    dismissal, *Stayton*, 791 F.2d at 21-22.[7] For example, when reversing a dismissal

3    with prejudice in *United States v. Taylor*, the Supreme Court faulted the district

4    court for ignoring "the brevity of the delay and the consequential lack of

5    prejudice" to the defendant who, by failing to appear, had caused the Act's

6    70-day indictment-to-trial period to be exceeded by only 14 nonexcludable days.

7    487 U.S. at 343. Echoing this concern, in *United States v. Hernandez*, this Court

8    held that dismissal with prejudice would not be warranted where the Act's

9    30-day arrest-to-indictment period was exceeded by 14 nonexcludable days after

10   the defendant, who was out on bond, had absconded. 863 F.2d at 240. We

11   reasoned that permitting reprosecution would be appropriate because "[t]he

12   offense was concededly serious, the delay was concededly short, there was no

13   evidence of bad faith or a pattern of neglect, and the defendant failed to

14   demonstrate any prejudice from the delay." *Id.* at 244. By contrast, in *United*

---

[7] While the length of the delay is critical to analysis of the "facts and
circumstances" factor, it is also intertwined with the element of prejudice, as we
will discuss. This is because "[w]hile long delays tend to increase the likelihood
of presumptive or actual prejudice to the defendant, in terms of his ability to
prepare for trial or the restrictions on his liberty, short delays . . . do not become
'serious' violations of the Speedy Trial Act unless there is some resulting

*States v. Stayton*, we ordered dismissal with prejudice largely based on the "dominating consideration" of "the sheer length" of the 23-month delay between voir dire and trial, concluding that "the enormity of the delay [was] sufficient alone to tip [the] second factor in favor of dismissal of the indictment with prejudice." 791 F.2d at 22–23.

### C.   Prejudice to Defendant

"'Although the absence of prejudice [to the defendant] is not dispositive,' it can be 'another consideration in favor of permitting reprosecution.'" *Wells*, 893 F.2d at 540 (quoting *Taylor*, 487 U.S. at 341). The length of the delay has a bearing on the issue of prejudice: "The longer the delay, the greater the presumptive or actual prejudice to the defendant, in terms of his ability to prepare for trial or the restrictions on his liberty." *Taylor*, 487 U.S. at 340.

But there are actually two types of prejudice relevant to this factor: (1) trial prejudice, i.e., prejudice in the defendant's ability to mount a defense at trial; and (2) non-trial prejudice. The Supreme Court has described the latter type of prejudice as follows:

---

prejudice to the defendant." *Hernandez*, 863 F.2d at 244 (citation and some internal quotation marks omitted).

21

1   Inordinate delay between public charge and trial, wholly aside from
2   possible prejudice to a defense on the merits, may seriously interfere
3   with the defendant's liberty, whether he is free on bail or not, and
4   may disrupt his employment, drain his financial resources, curtail
5   his associations, subject him to public obloquy, and create anxiety in
6   him, his family and his friends.

7

8   *Taylor*, 487 U.S. at 340–41 (internal alterations and quotation marks omitted); *see*

9   *also Moss*, 217 F.3d at 431–32 (holding that the district court erred when it

10  "neglected to address any non-trial prejudice suffered by [the defendant],"

11  including the "impact [of his incarceration] on his life circumstances").

12      It is well established that a criminal defendant has "no obligation to take

13  affirmative steps to insure that [he will] be tried in a timely manner." *United*

14  *States v. Tunnessen*, 763 F.2d 74, 79 (2d Cir. 1985). It is the court and the

15  government that bear the affirmative obligation of insuring the speedy

16  prosecution of criminal charges. *United States v. Vasquez*, 918 F.2d 329, 336 (2d

17  Cir. 1990). A criminal defendant can only waive his speedy trial rights by failing

18  to invoke them before trial or plea. *See* 18 U.S.C. § 3162(a)(2); *see also United States*

19  *v. Gambino*, 59 F.3d 353, 360 (2d Cir. 1995) ("The legislative history of the Act

20  confirms the importance of the non-waiver rule."). Thus, while a district court is

21  entitled to construe a defendant's delay in articulating his cognizance of the

22

1   violation as evidence that he did not suffer actual prejudice, this fact is not fatal

2   to the defendant's claim, and it is not the end of the court's inquiry into

3   prejudice. *See Stayton*, 791 F.2d at 22 (declining to decide "whether, and if so,

4   how seriously" the 23-month delay prejudiced the defendant, where "the

5   enormity of the delay is sufficient alone to tip this second factor in favor of

6   dismissal of the indictment with prejudice"). The sheer length of a delay may

7   support a finding of non-trial prejudice and thereby tip the prejudice factor in

8   favor of dismissal with prejudice to a defendant's reprosecution.

9   **D.    Impact of Reprosecution on the Administration of the Act and on**
10  **the Administration of Justice**

11

12         It is beyond question that "[d]ismissal without prejudice is not a toothless

13  sanction." *Id.* at 342. But it is equally doubtless that the sanction of dismissal with

14  prejudice has more bite. *See id.* ("It is self-evident that dismissal with prejudice

15  always sends a stronger message than dismissal without prejudice, and is more

16  likely to induce salutary changes in procedures, reducing pretrial delays.").

17  Although the less severe sanction "imposes some costs on the prosecution and

18  the court," *Zedner v. United States*, 547 U.S. 489, 499 (2006), "the prosecutor may

19  of course seek—and in the great majority of cases will be able to obtain—a new

23

1  indictment," *id.*; *see also* 18 U.S.C. § 3288 (providing that even if "the period

2  prescribed by the applicable statute of limitations has expired, a new indictment

3  may be returned . . . within six calendar months of the date of the dismissal").

4  Consequently, "if the government suffers only dismissals without prejudice on

5  motion of the defendant, it in effect gains successive 70-day periods in which to

6  bring the defendant to trial." *Giambrone*, 920 F.2d at 180.

7        The Act's purpose of expeditiously bringing criminal cases to trial would

8  not be served by assuring those charged with this responsibility that they need

9  not fear the more severe sanction—no matter how egregious the violation—as

10  long as they refrain from intentional efforts to circumvent the Act. The burden on

11  courts and prosecutors of reindicting a defendant is, at a minimum, not

12  substantially more onerous than the routine business of ensuring vigilant

13  compliance. Accordingly, "the knowledge that a violation could potentially

14  result in [dismissal with prejudice] gives the prosecution a powerful incentive to

15  be careful about compliance," *Zedner*, 547 U.S. at 499, an incentive that would be

16  absent under a regime requiring a showing of bad faith. Preserving the threat of

17  dismissal with prejudice in cases of administrative neglect also furthers the Act's

18  purpose by incentivizing courts to police their own dockets. "While not all

24

1   violations of the Speedy Trial Act warrant a dismissal with prejudice, the

2   purposes of the Act would be thwarted if courts do not adjust their day-to-day

3   procedures to comply with its requirements." *Moss*, 217 F.3d at 432.

4        Furthermore, under a regime that limited the more severe sanction

5   exclusively to cases of intentional misconduct, criminal defendants would have

6   little incentive to alert the court to administrative oversights that held no

7   conceivable promise of precluding reprosecution. *See Barker v. Wingo*, 407 U.S.

8   514, 521 (1972) (noting "[d]elay is not an uncommon defense tactic"); *accord*

9   *Caparella*, 716 F.2d at 981 ("[A] defendant might find it advantageous to play a

10  waiting game hoping, for example, that government witnesses may disappear or

11  become forgetful."). The complacency of criminal defendants would not,

12  however, further the purposes of the Act, which "serves not only to protect

13  defendants, but also to vindicate the public interest in the swift administration of

14  justice." *Bloate v. United States*, 559 U.S. 196, 211 (2010).

15       "[T]here is a societal interest in providing a speedy trial which exists

16  separate from, and at times in opposition to, the interests of the accused." *Barker*,

17  407 U.S. at 519. The Act's demand that justice be swiftly administered serves the

18  public interest by, among other things, avoiding extended pretrial delays, which

25

may "impair[ ] the deterrent effect of punishment," *Zedner*, 547 U.S. at 501, or

"risk the loss of important evidence," *Giambrone*, 920 F.2d at 181. "Whenever [a

prosecution]—for whatever reasons—falls short of meeting the Act's

requirements, the administration of justice is adversely affected." *Ramirez*, 973

F.2d at 39. "Certainly, the public is the loser when a criminal trial is not

prosecuted expeditiously, as suggested by the aphorism, 'justice delayed is

justice denied.'" *Gambino*, 59 F.3d at 360.

It is also clear that the administration of justice—and certainly of the

Act—would be well served by whatever actions the court may need to undertake

in order to avoid future speedy trial violations. Accordingly, district courts

should identify and explain the administrative neglect that caused the particular

delay at issue, as well as consider any potential administrative changes that

might be warranted in light of that violation.

And prosecutors should contribute to this process as well. Even though

prosecutors do not "bear the burden of monitoring the court's compliance with

the [Act] in absence of an announced rule, district courts do look to prosecutors

for assistance as officers of the court." *Ramirez*, 973 F.2d at 39. As a nation, we

demand a great deal from our United States District Courts and the judges who

are called to serve on them. District courts in this Circuit and across the country shoulder heavy and complex caseloads—the Eastern District of New York more so than most.[8] Given the myriad of administrative demands that accompany these tasks, and in light of the government's "affirmative obligation to insure the

---

[8] The Administrative Office of the United States Courts publishes Federal Court Management Statistics on an annual basis. These statistics reveal that the United States District Court for the Eastern District of New York ("E.D.N.Y.") has one of the busiest dockets not only in this Circuit, but among all 94 district courts in the nation. The data covering the 12-month period ending on March 31, 2014 (which encompasses the majority of the period of delay in this case), reveals the following: The E.D.N.Y. was ranked second in this Circuit and eleventh nationally with respect to percent change in total filings over the previous year. Administrative Office of the United States Courts, Federal Court Management Statistics of the District Courts (March 2014), http://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2014/03/31-0. The E.D.N.Y. ranked second in this Circuit and twenty-second nationally with respect to total filings per active judgeship (and first in this Circuit and thirteenth nationally in civil filings). The amount of time and attention the court must devote to these filings varies greatly, however, and in terms of weighted filings per active judgeship, the E.D.N.Y. outpaced all other districts in this Circuit, and ranked eighth nationally. The 2014 statistics also reveal that the E.D.N.Y. had 838 pending cases per active judgeship, placing second in this Circuit and seventh nationally. Despite this workload, the E.D.N.Y. terminated 515 cases per active judgeship, placing it second in this Circuit and thirty-eighth nationally. The pace of judicial life in that district has hardly slowed down, if at all, in the time since it ruled on Bert's motion to suppress, Administrative Office of the United States Courts, Federal Court Management Statistics of the District Courts (June 2015), http://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2015/06/30-3, and that court is now operating with one of its fifteen seats vacant.

speedy prosecution of criminal charges," *Vasquez*, 918 F.2d at 336, we

agree—emphatically—that "it is wise for prosecutors to be alert to [Speedy Trial

Act] calculations in order to aid the court in its enforcement" of that Act, *Ramirez*,

973 F.2d at 39. Once a motion has been taken under advisement the government

may not simply wash its hands of any further involvement and be assured the

benefit of dismissal without prejudice in the event that the Speedy Trial Act is

violated due to the court's administrative neglect. Although the government is

not required to monitor and notify the court of impending and expired speedy

trial deadlines, any such action on the part of the government is properly taken

into consideration when evaluating "the facts and circumstances of the case

which led to the dismissal," 18 U.S.C. § 3162(a)(2), and may weigh in favor of

dismissal without prejudice.

## III.   The District Court's Application of the Framework

Although the district court appropriately identified all of the statutory

factors it was required to consider in determining whether dismissal should be

with or without prejudice, we conclude that its analysis of those factors was

incomplete and it did not "clearly articulate their effect in order to permit

meaningful appellate review." *Taylor*, 487 U.S. at 336.

28

1    Because Bert concedes that his offense was serious, we need not analyze

2    the district court's finding in this regard.

3    As to the facts and circumstances leading to the delay, the court stated:

4    It was the court that caused the delay. There was no bad faith by the
5    government. If anything, the government didn't press forward and ask for
6    the interest of justice exclusion, but their failure to do so was not . . . gross
7    neglect or [a] pattern of neglect or an attempt to circumvent the Speedy
8    Trial Act to gain some benefit for the government or to flout the standards
9    and the requirements of the Speedy Trial Act. On the Court's part, there
10   was no attempt . . . to manipulate the speedy trial clock.
11
12   Special App'x at 30. After discussing several other factors, the court returned to

13   the reason for delay, stating:

14   I have already discussed the facts and circumstances of how the delay
15   occurred. Here, too, there is no bad faith on the part of the government.
16   This was not a pattern of delay on the part of the government. There
17   [were] no intentional acts on the part of the government to delay this case.
18   Again, the Court takes the weight, if you will, for the delay here. Again,
19   there was no intention on the Court to somehow circumvent, manipulate
20   or otherwise intentionally or in bad faith delay this action.
21
22   Special App'x at 32–33.

23   We read the district court's analysis of the facts and circumstances leading

24   to the delay as premised implicitly on two erroneous interpretations of the

25   governing legal standards: first, that the absence of bad faith, intentional delay,

26   or some other form of heightened scienter is dispositive of this statutory factor;

29

second, that a delay attributable to the court and not to the government tips this factor in favor of dismissal without prejudice. Both of these premises are contrary to governing precedent. The district court's analysis of the "facts and circumstances" factor was further deficient because it failed to consider the effect of the length of delay on the weight to be attributed to this factor.

Of course, we accept the district court's finding that neither the government nor the court acted out of any nefarious or underhanded motive. As noted above, however, bad faith is not a prerequisite to ordering dismissal with prejudice. We commend the district court's honest and unequivocal acceptance of responsibility for the delay, but the mere fact that a speedy trial violation is attributable to the court and not the government does not expunge that violation, nor does it automatically render the violation any less serious. Neither the record nor the district court's ruling provides us with any explanation for the court's serious delay in ruling on a motion that does not appear to present any novel legal questions or distinct factual complexity. Moreover, there is no analysis of whether what occurred here is part of a pattern of delay on the part of either the government or the court in the Eastern District of New York. Thus, we are unable adequately to review the "facts and circumstances" factor on appeal. On

30

remand the district court is free to exercise its discretion to receive and further consider such evidence as may be offered on this issue.

As to the seriousness of the delay, the district court acknowledged "the length of time that the Court took ultimately to decide the motion to suppress," describing it as "lengthy." Special App'x at 29. The court's discussion of the length of the delay went no further but on remand could usefully include, for example, a calculation or acknowledgment of the actual time that the motion remained under advisement, an evaluation of the severity of this delay and how this "lengthy" period of time compared to delays, if any, in other cases. The district court neither fully analyzed the length of the delay, nor addressed whether and how the length of the delay affected the weight it attributed to the "facts and circumstances" factor.[9] It is free to do so on remand.

With regard to the prejudice factor, the district court properly determined that Bert suffered no trial prejudice, but it did not consider non-trial prejudice. The district court alluded to this latter form of prejudice when it asserted that the

---

[9] In discussing prejudice to the defendant, the district court acknowledged the length of the violation while also factoring in Bert's silence during the nine-month period after his speedy trial clock expired against him. *See* Special App'x at 33 ("But, again here, there was no complaint by the defendant for the nine months that we are talking about . . . .").

1    court was not "minimizing the incarceration to the defendant." Special App'x at

2    33. It then proceeded, however, to discount the likelihood that Bert suffered any

3    prejudice in light of his failure promptly to alert the court after his speedy trial

4    clock had expired. Pointing to *United States v. Siembida*, No. 05-cr-366 (PKC), 2007

5    WL 4267192 (S.D.N.Y. Dec. 3, 2007), a district court memorandum and order, the

6    court here suggested "that where the defendant does not come forward and

7    assert his rights[,] he is more interested in a dismissal of his case than vindicating

8    his rights under the Speedy Trial Act." Special App'x at 34. On remand, the

9    district court may wish to further assess this factor, especially given that Bert

10   "had no obligation to take affirmative steps to insure that [he] would be tried in a

11   timely manner." *Tunnessen*, 763 F.2d at 79.

12        Analyzing the impact of reprosecution on the administration of the Speedy

13   Trial Act, the district court concluded "the fact that the government will have to

14   reindict here served as a deterrent, particularly here where there is no bad faith

15   or intentional conduct or pattern on the part of the government" and Bert's crime

16   is serious. Special App'x at 33. The fact that the government must reindict the

17   defendant is not a particularly strong deterrent, however, and the district court

18   might further consider any other effect that its decision could have on the

32

1    administration of the Speedy Trial Act. Such further analysis would include the

2    likelihood of repeated violations and whether there are potential administrative

3    changes prompted by this violation.

4          Up to this point in our analysis we have focused on the district court's role

5    in the speedy trial violation in this case largely because the court fell on its sword

6    by finding that it, and not the government, was to blame. While we do not

7    disturb the court's finding in that regard, we further address this final factor of

8    the statutory analysis, shifting the spotlight back to the government.

9          In this case, the government did not notify the court that the speedy trial

10   deadline was approaching or had passed. It took no action whatsoever in this

11   case during the year in which Bert's motion was under advisement. *Cf. Stayton*,

12   791 F.2d at 18 ("During this [sixteen month delay], the assistant United States

13   attorneys on the case sent seven reminder letters to the court and went so far as

14   to make a motion for a decision on this and several other pending pretrial

15   motions."). We recognize, of course, in spite of the government's negligent

16   conduct, a single isolated violation of the Speedy Trial Act cannot support a

17   decision to dismiss with prejudice. Again, however, given the dearth of evidence

18   in the record regarding any pattern of such neglect or the reasons for the delay in

33

1    deciding the suppression motion, we are precluded from meaningfully

2    reviewing the district court's analysis of this final factor.

3        We thus remand this case to the district court so that it may complete its

4    analysis of whether to dismiss with or without prejudice in light of the foregoing

5    discussion and in conformance with the directions that follow.

6                                    *       *       *

7    We intimate no view as to the decision the district court should reach on remand

8    and leave that to the sound discretion of the district court.

9                          **Sixth Amendment Speedy Trial Claim**

10       We turn finally to Bert's additional argument that the district court's delay

11   violated his Sixth Amendment right to a speedy trial. Courts must balance the

12   following four factors when analyzing whether a defendant's constitutional right

13   to a speedy trial has been violated: 1) the length of the delay, 2) the reason for the

14   delay, 3) the defendant's assertion of his right, and 4) the prejudice to the

15   defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *United States v. Cain*, 671 F.3d

16   271, 296 (2d Cir. 2012). We review for abuse of discretion a district court's

17   balancing of these factors. *United States v. Williams*, 372 F.3d 96, 113 (2d Cir.

18   2004).

34

1    We recognize that analysis of this constitutional claim overlaps

2  significantly with the analysis required under the Speedy Trial Act. Indeed, the

3  district court examined these two claims together. On remand, therefore, the

4  district court should also reexamine its analysis of Bert's constitutional claim,

5  further informed by its reanalysis of the factors under the Speedy Trial Act that

6  are relevant to a Sixth Amendment speedy trial analysis. As with the Speedy

7  Trial Act issue, we intimate no view regarding how this constitutional issue

8  should be decided.

9                                   **CONCLUSION**

10    For the foregoing reasons, we affirm the district court's decision denying

11  Bert's motion to suppress.   We remand for further proceedings consistent with

12  this opinion.

13    If on further consideration of the Speedy Trial Act factors, the district court

14  continues to exercise its discretion to dismiss the original indictment without

15  prejudice, it shall enter an order to that effect.   If on the other hand the district

16  court determines that the original indictment should have been dismissed with

17  prejudice, then it shall enter a new judgment embodying that disposition.

1        Either party may thereafter appeal from the district court's order or new

2    judgment, as the case may be.

3         Pending issuance of the mandate in this case, the district court may want

4    to re-examine the conditions applicable to Bert's conditions of release. *See*

5    Footnote 2, *supra*; 18 U.S.C. §§ 3141, 3143(a), (b).

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

36

DENNIS JACOBS, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority opinion insofar as it affirms the denial of the suppression motion; I dissent as to the rest, with the exception of footnote 8.

The district court took one year to consider and decide a suppression motion that was complicated, ramified, and virtually outcome-determinative-- without making the required periodic findings that the delay was in the interest of justice.  The contentious issue is whether the district court had discretion to dismiss this case under the Speedy Trial Act *without* prejudice, as it did.  Instead of answering affirmatively this easiest of appellate questions (and affirm), the majority remands for a new exercise of discretion, which is unneeded, to say the least.  The district court's decision to dismiss without prejudice is so well supported by settled principles that it is unassailable, even uninteresting.

There are several first principles:  As between dismissal with prejudice and without, "neither remedy [is to be] given priority," United States v. Taylor, 487 U.S. 326, 335 (1988);  "[d]ismissal without prejudice is not a toothless sanction," id. at 342; and "dismissal of a criminal indictment is a drastic remedy which should not be lightly considered," United States v. Fox, 788 F.2d 905, 909 (2d Cir. 1986).

CERTIFIED COPY ISSUED ON 02/09/2016

Since the seriousness of the crime is one salient consideration, it matters that Bert was a felon who had been using drugs, possessed a firearm with an obliterated serial number, was carrying it in the hallway of a residential building, and tossed the gun from the hallway window to land in a courtyard where residents had a right to be.

## I

Two officers responded to a report made by the security guard of a residential building, and encountered on arrival two men in the lobby who admitted they did not live in the building, and who were directed to leave. The security guard told the officers that more trespassers were on the tenth and twelfth floors. In the tenth floor hallway, the officers saw Bert and two others, who claimed that they were visiting a friend in Apartment 10L, who disclaimed knowledge of the group (or did not answer) until Bert told her: "Tell them you know me," which she did. Disbelieving the response that Bert had prompted, and observing Bert pacing back and forth with his body turned away from them, one of the officers drew his gun and asked to see Bert's hands. The other officer saw Bert adjust his sweatshirt, revealing a gun, and remove the gun from his waistband as he moved toward an open window. In the ensuing struggle to

2

handcuff Bert, a magazine was released from the gun and landed on the floor, and the gun went out the window to the courtyard, where it was recovered by the police.

After being given warnings at the precinct, Bert asked whether the gun was still operable, gloating that he could not be charged with possessing a loaded firearm because the magazine had been ejected, and that the firearm probably was not in working order because he had thrown it out a tenth-floor window.  A bit later, Bert predicted that he would beat the case because the firearm was inoperable.  Eventually, he was charged with being a felon in possession of a firearm and with possession of a firearm with an obliterated serial number.  18 U.S.C. § 922(g)(1), (k).

On June 25, 2012, Bert filed his suppression motion.  The district court's resolution of that motion caused the delay that (in the absence of interest-of-justice findings) violated the Speedy Trial Act.  The motion, never simple, became increasingly complex as the government responded, Bert supplemented his arguments, six witnesses testified at the hearing, and post-hearing submissions proliferated on a score of contentious issues.

3

One year after the close of those proceedings, the district court denied the suppression motion, in a 24-page opinion.  Bert then moved to dismiss with prejudice, citing his statutory and constitutional rights to a speedy trial.  The statutory speedy trial clock had begun to run on March 4, 2013, 30 days after the last brief was filed on the suppression motion.  See 18 U.S.C. § 3161(h)(1)(D), (H).  Because Bert was not brought to trial within 70 days thereafter, the government conceded a statutory violation, see id. § 3161(c)(1), but argued that there had been no constitutional violation and that dismissal under the Act should be without prejudice to reprosecution.

The district court found no constitutional violation, and, after considering each relevant factor, dismissed without prejudice.  After reindictment, a three-day jury trial resulted in conviction on both counts.  Bert was sentenced principally to ten years' imprisonment.

## II

In deciding between dismissal with prejudice or dismissal without, the district court considers statutory factors: seriousness of the offense; the facts and circumstances that led to dismissal; and the impact on the administration of the Act and on the administration of justice.  18 U.S.C. § 3162(a)(2).  The court also

4

considers the length of the delay, <u>Taylor</u>, 487 U.S. at 340, and prejudice to the

defendant, <u>United States v. Wilson</u>, 11 F.3d 346, 352 (2d Cir. 1993).

The single principle that decides this appeal is recited in the majority

opinion:  "The Supreme Court has . . . instructed that courts should only preclude

reprosecution of a serious crime upon a showing of 'something more than an

isolated unwitting violation,' such as a finding of 'bad faith' or a 'pattern of

neglect.'"  Maj. Op. at 18 (quoting <u>Taylor</u>, 487 U.S. at 339).  The majority opinion,

relying on First Circuit cases, asserts that such a pattern of neglect (warranting

dismissal with prejudice) may be manifested either by the government *or by the*

*court*.  <u>Id.</u> at 16-18.  Not so.  We have held that: "[I]n the absence of a factually

supported finding of bad faith or a pattern of neglect *by the local United States*

*Attorney*, an 'isolated unwitting violation' of the Speedy Trial Act cannot support

a decision to dismiss with prejudice."  <u>United States v. Hernandez</u>, 863 F.2d 239,

244 (2d Cir. 1988) (emphasis added) (quoting <u>Taylor</u>, 487 U.S. at 339); <u>see also</u>

<u>United States v. Wells</u>, 893 F.2d 535, 539 (2d Cir. 1990) (same).  The majority does

not even intimate that the judge or her court engaged in a pattern of neglect or

delay.  To the contrary, the majority's footnote 8 demonstrates by statistics the

giant workload and dizzying productivity of the judges of that court.  In any

5

event, this is not the First Circuit, and a three-judge panel of this Court cannot alter Second Circuit law.  <u>Veltri v. Bldg. Serv. 32B-J Pension Fund</u>, 393 F.3d 318, 327 (2d Cir. 2004).

As to bad faith, there is no issue in this case, as the majority recognizes and concedes.  Maj. Op. at 28-29.  The majority opinion further "recognize[s], of course, in spite of the government's negligent conduct, a single isolated violation of the Speedy Trial Act cannot support a decision to dismiss with prejudice."  <u>Id.</u> at 33.

As to a pattern:  Passages quoted in the majority opinion contain the district court's categorical findings that: the government's failure to prompt the judge "was not . . . [a] pattern of neglect"; and "[t]his was not a pattern of delay on the part of the government."  <u>Id.</u> at 28; <u>see also</u> Special App'x at 30, 32.  There was thus no pattern of neglect or pattern of delay amounting to a "demonstrably lackadaisical attitude."  <u>United States v. Giambrone</u>, 920 F.2d 176, 180 (2d Cir. 1990).

So it is settled that dismissal must be without prejudice if the offense was serious.  And as to that, there is no dispute.  An offense involving a firearm with an obliterated serial number, carried in a residential hallway, is serious indeed.

6

The majority opinion acknowledges this in a perfunctory way, observing that seriousness is uncontested.  Maj. Op. at 16.  The district court's opinion explains its ruling in appropriate and compelling detail:

> It is a violent crime.  The defendant possessed a loaded and defaced firearm.  He's a felon in possession of a firearm . . . . The defendant is facing a ten-year and a five-year statutory maximum on each count.  The government calculates his guidelines as a level 28.  The defendant is in criminal history category number four, based on three prior arrests, including a prior arrest for possession of a weapon.  The defendant faces a lengthy period of incarceration here and, in addition to this just being a straight possession case, as the evidence at the suppression hearing showed, the defendant didn't behave passively during the encounter that led to his arrest.  He tried to secret the gun or get rid of the gun, through a window, and in doing so struggled with the arresting officer, putting himself, the officer and the bystanders in harm's way.

Special App'x at 31-32.

Even if seriousness is scored on a continuum, the offense here is life-threatening; Bert's prior felony convictions include witness tampering (Bert and his co-conspirators violently assaulted a woman to prevent her from testifying in a criminal proceeding related to a homicide), drug trafficking (in connection with which Bert possessed a loaded semiautomatic firearm and body armor), and possession of a gun used to commit a homicide (Bert supplied the murder weapon and acted as lookout).  Given the seriousness of the offense, it is easy to see why the district court had no reason to dilate on some of the other factors.

## III

Under settled law, that is that.

Everything else that the majority opinion suggests be done or considered by the district court on remand is unnecessary, and fueled by dicta.

- District courts are told to "identify and explain the administrative neglect that caused the particular delay at issue . . . ."  Maj. Op. at 25-26.  Although the cause seems perfectly obvious (and innocuous), the majority questions whether the suppression motion required substantial work and delay, saying that the motion "does not appear to present any novel legal questions or distinct factual complexity."  Id. at 30.  However, the majority opinion, which takes pages and pages to set out the facts and law bearing on the suppression issue, thus refutes itself.  We do not issue written opinions to decide simple and settled matters.[1]

---

[1] Of course, given the seriousness of the offense and absence of a pattern of neglect, this is all beside the point.

- The majority suggests that district courts "consider any potential administrative changes that might be warranted . . . ." Maj. Op. at 26. It is hard to understand why this is our concern, at least unless and until a systemic failure is encountered. The chief judge of the Eastern District of New York has the applicable administrative jurisdiction; and the Second Circuit Judicial Council approves changes to the administrative rules of the district courts. See supra footnote 1.

- The majority instructs that "prosecutors should contribute to this process as well." Maj. Op. at 26. If there are to be changes in the court's procedures, I can't see why prosecutors are to be engaged in it, or why the Federal Defender is left out of it--or for that matter, James Darrow, who is Bert's counsel. See supra footnote 1.

- For purposes of remand, the majority identifies two errors that the district court did not commit: deeming scienter decisive, and discounting any delay attributed to the court rather than the prosecution. Maj. Op. at 29. See supra footnote 1.

9

- The majority suggests that the district court "may wish to further assess" whether the delay caused Bert to suffer any non-trial prejudice.  Maj. Op. at 31.  But Bert has never claimed or specified any actual non-trial (or trial) prejudice, either in the district court or on appeal.  It is Bert who bears the burden of proof, <u>see</u> <u>United States v. Adams</u>, 448 F.3d 492, 503 (2d Cir. 2006) (quoting 18 U.S.C. § 3162(a)(2)), and on this point the information would have been entirely within his knowledge.  <u>See</u> <u>supra</u> footnote 1.

- The majority suggests that the district court "might further consider any other effect [other than re-indictment] that its decision [to dismiss without prejudice] could have on the administration of the Speedy Trial Act."  Maj. Op. at 32.  Surely, one consideration is that release of Bert on a technicality would stir disrespect for the administration of justice and for the Speedy Trial Act in particular.  <u>See</u> <u>supra</u> footnote 1.

10

- The majority cites "the dearth of evidence in the record regarding [inter alia] any pattern of . . . neglect."  Maj. Op. at 33.  Exactly: There is no evidence of a pattern of neglect or delay, and *the burden of proof rested on the defendant*.  See Adams, 448 F.3d at 503 (quoting 18 U.S.C. § 3162(a)(2)).  Certainly, it is strange to doubt a finding on the ground that there is a lack of evidence to impugn it.  See supra footnote 1.

In summary, the majority invites the district court to make more findings and to re-balance the factors in the supposed light of the majority's dicta.  That is all unnecessary, as a matter of law:  See supra footnote 1.  At the same time, however, the issue is left to the discretion of the district court, which is where it was located by Congress, and the district court's ultimate exercise of discretion will be subject to review by another panel, selected by random assignment in the usual course.

*** 

The majority misconstrues the cause of the violation, which is not delay itself, but the failure to make periodic findings that the delay needed to decide

11

Bert's suppression motion was in the interest of justice.  Those findings are the only robotic incantations required by our law.  While vigilant conduct by the prosecution would certainly prompt such findings, it is unknown for an appellate court to look behind them.  The importance of such findings is not for me to assess; it is enough that they are required.  But let us not wring our hands over the absence of incantations in this case, which is a trivial defect among actual problems in our criminal justice system.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

12